## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DERRICK CHEROTI, Derivatively on Behalf of SERITAGE GROWTH PROPERTIES, | Case No.: |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| ANDREA OLSHAN, ADAM METZ, JOHN GARILLI, MITCHELL SABSHON, JOHN T. MCCLAIN, SHARON OSBERG, ALLISON LAINE THRUSH, TALYA NEVO-HACOHEN, and MARK WILSMANN, | |
| Defendants, | |
| SERITAGE GROWTH PROPERTIES, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Derrick Cheroti ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Seritage Growth Properties ("Seritage" or the "Company"), brings this Verified Shareholder Derivative Complaint against Andrea Olshan ("Olshan"), Adam Metz ("Metz"), John Garilli ("Garilli"), Mitchell Sabshon ("Sabshon"), John T. McClain ("McClain"), Sharon Osberg ("Osberg"), Allison Laine Thrush ("Thrush"), Talya Nevo-Hacohen ("Hacohen"), and Mark Wilsmann ("Wilsmann") (collectively, the "Individual Defendants" and, together with Seritage, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Seritage with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *Zhengxu He, Trustee of the He & Fang 2005 Revocable Living Trust v. Seritage Growth Properties, et al.*, Case No. 1:24-cv-05007 (S.D.N.Y) (the "Securities Class Action"), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought against certain current and former Seritage officers and members of the Company's Board of Trustees (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between July 7, 2022 and May 10, 2024, inclusive (the "Relevant Period").

2.    Seritage is a real estate investment trust ("REIT") that was formed in 2015 and engaged in the ownership, development, and leasing of retail and mixed-use properties.

3.    In 2022, Seritage revoked its REIT status and sought shareholder approval of a proposed plan of sale of the Company's assets and eventual dissolution (the "Plan of Sale"). Pursuant to the Plan of Sale, to the Board would sell the Company's assets, distribute the net proceeds to shareholders, and dissolve the Company "to maximize value for [] shareholders."

4.    The Company subsequently announced that it expected "to distribute the net proceeds of our plan of sale to our shareholders. Based upon management's review and evaluation with its advisors . . . we have estimated . . . that the Estimated Total Shareholder Distributions Range will be between $18.50 and $29.00 per share. Our Estimated Total Shareholder

Distributions Range was derived from the estimated total gross asset sale proceeds, less [expenses, debts, and wind-down costs.]" The Plan of Sale was approved by the Company's shareholders on October 24, 2022.

5.       However, on August 14, 2023, Seritage revealed a "material weakness" in the Company's internal control over financial reporting "due to a deficiency in the design of our control over the identification of impairment indicators for investments in real estate and documentation of evidence of review." According to the Company, the deficiency related "to the failure to identify potential indicators of impairment related to development projects in a timely manner."

6.       On this news, the Company's stock price fell more than 9%, from a closing price of $8.89 per share on August 14, 2023 to a closing price of $8.03 per share on August 15, 2023.

7.       On May 10, 2024, the Company revealed that it would be "adjusting [its] pricing projections for some of [its] assets" and that as a result, the gross value of the Company's portfolio of assets was reduced by at least $325 million.

8.       On this news, the Company's stock price fell more than 27.3%, from a closing price of $9.32 per share on May 10, 2024 to a closing price of $6.78 per share on May 13, 2024.

9.       As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Olshan and Garilli on July 1, 2025 in the United States District Court for the Southern District of New York.

10.      As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims asserted herein raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a) and SEC Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

13.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

16.     Plaintiff is a current shareholder of Seritage and has continuously held Seritage common stock at all relevant times.

17.      Nominal Defendant Seritage is incorporated under the laws of Maryland and its principal executive offices are located at 500 Fifth Avenue, Suite 1530, New York, NY 10110. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol

"SRG."

18.     Defendant Olshan served as the Company's Chief Executive Officer and as a Company trustee from February 2021 until April 2025. According to the proxy statement filed on Schedule 14A with the SEC on April 23, 2024 (the "2024 Proxy"), in 2023, Defendant Olshan received $2,404,615 in total compensation from the Company.

19.     Defendant Metz has served as a Company trustee since 2022. According to the 2024 Proxy Statement, in 2023, Defendant Metz received $175,000 in compensation from the Company.

20.     Defendant Garilli has served as the Company's Interim Chief Financial Officer ("CFO") since 2022. Garilli is a member of Winthrop Capital Advisors, LLC ("Winthrop"). According to the 2024 Proxy, Seritage is party to an agreement with Winthrop, pursuant to which Winthrop provides Seritage with comprehensive property management services and property accounting support as well as the services of Defendant Garilli and other Winthrop executives. In exchange for these services, the Company paid Winthrop a fee of $108,333 per month in 2023, plus reimbursement for the salaries, bonuses and benefits for certain employees of Winthrop (other than Defendant Garilli) who devote time to Seritage.

21.     Defendant Sabshon has served as a Company trustee since 2022. Defendant Sabshon serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of its Audit Committee. According to the 2024 Proxy, in 2023, Defendant Sabshon received $140,000 in compensation from the Company.

22.     Defendant McClain has served as a Company trustee since 2015. Defendant McClain serves as Chair of the Board's Audit Committee and Compensation Committee. According to the 2024 Proxy, in 2023, Defendant McClain received $155,000 in compensation from the Company.

23.     Defendant Osberg served as a Company trustee from 2020 until 2023. According to the 2024 Proxy, in 2023, Defendant Osberg received $43,407 in compensation from the Company.

24.     Defendant Thrush has served as a Company trustee since 2019. Defendant Thrush serves as a member of the Board's Nominating and Corporate Governance Committee and Audit Committee. According to the 2024 Proxy, in 2023, Defendant Thrush received $125,000 in compensation from the Company.

25.     Defendant Nevo-Hacohen has served as a Company trustee since 2022. Defendant Nevo-Hacohen serves as a member of the Board's Compensation Committee. According to the 2024 Proxy, in 2023, Defendant Nevo-Hacohen received $140,000 in compensation from the Company.

26.     Defendant Wilsmann has served as a Company trustee since 2022. Defendant Wilsmann serves as a member of the Board's Nominating and Corporate Governance Committee and Compensation Committee. According to the 2024 Proxy, in 2023, Defendant Wilsmann received $125,000 in compensation from the Company.

27.     Defendants Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Osberg, Thrush, and Wilsmann are herein referred to as the "Proxy Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers, directors, and/or fiduciaries of Seritage and because of their ability to control the business and corporate affairs of Seritage, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the

6

Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

29.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

31.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

        (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating

truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

32.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## THE CODE OF BUSINESS CONDUCT AND ETHICS

33.     Seritage maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which states that it "applies to all officers and employees. . . and the trustees, of the Company."

34.     In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct states as follows:

> The Company's success requires a commitment on the part of all of its employees to the proper allocation and use of its assets, tangible and intangible. For these purposes, the Company's assets include equipment, supplies, real estate, tools, inventory, computer systems and equipment, computer software, computer data, vehicles, records or reports, nonpublic information, intellectual property or other sensitive information or materials, and telephone, voice-mail, or e-mail communications, as well as Company funds in any form. We have a duty to protect the Company's assets from loss, damage, misuse, theft or sabotage. We must also ensure the efficient use of the Company's assets. While the Company's communications systems and networks are provided for the conduct of its business, personal use of telephones, facsimile machines, voice-mail, e-mail and internet systems is permitted as long as the use complies with guidelines described in this Code.

35.     In a section titled "Accurate Books and Records," the Code of Conduct states as follows:

> The Company has adopted a system of internal disclosure controls and procedures to assure that all important information regarding the business and prospects of the Company is brought to the attention of our Chief Executive Officer and Chief Financial Officer. The Company's internal controls are essential to the integrity of the Company's financial records and financial statements. The accuracy and timeliness of compliance are necessary to enable our executive officers to provide the financial statements and periodic report certifications required by federal law. Employees should promptly report (anonymously, confidentially or otherwise) any actual or suspected breaches or violations of the Company's internal controls or any

concerns or complaints regarding questionable accounting or auditing in accordance with the Company's Whistleblower Policy or anonymously through the Governance Hotline at 844-525-1314 . Potential fraudulent transactions include, without limitation, embezzlement, forgery or alteration of checks and other documents, theft, misappropriation or conversion to personal use of Company assets, and falsification of records. Employees must be candid in discussing matters concerning internal controls and business disclosures with the Company's trustees, management, internal and outside auditors, and inside and outside counsel.

36.    In a section titled "Waiver of the Code of Business Conduct and Ethics," the Code

of Conduct states as follows:

Any request for a waiver of any standard in this Code may be granted only by an employee's immediate supervisor and only after advance notice to, and consultation with, the General Counsel, or, in those instances required by this Code, the Chief Executive Officer. Waivers involving any of the Company's executive officers or trustees may be made only by the Audit Committee of the Board of Trustees and must be disclosed to the Company's shareholders

## THE AUDIT COMMITTEE CHARTER

37.    Seritage maintains a Charter of the Audit Committee (the "Charter"), which states

that the purpose of the Audit Committee is to:

assist the Board in overseeing (1) the accounting and financial reporting processes of the Company, the audits of the Company's financial statements and the integrity of the Company's financial statements, (2) the independent auditor's qualifications and independence, (3) the effectiveness of the Company's internal control structure, (4) the compliance by the Company with legal and regulatory requirements and (5) management of risks from cybersecurity threats to the Company.

38.    In a section titled "Committee Authority and Responsibilities," the Charter states

as follows, in relevant part:

The Audit Committee shall pre-approve all auditing services, internal control-related services and permitted non-audit services (including the fees and terms thereof) to be performed for the Company and its subsidiaries by its independent auditor, as required by applicable law and Commission rules. The Audit Committee shall review and discuss with the independent auditor any documentation supplied by the independent auditor as to the nature and scope of any tax services to be approved, as well as the potential effects of the provision of such services on the independent auditor's independence.

\*     \*     \*

The Audit Committee shall make regular reports to the Board. The Audit Committee shall conduct an annual performance self-evaluation and shall report to the Board the results of the self evaluation. The Audit Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

The Audit Committee, to the extent it deems necessary or appropriate, shall:

**Financial Statement and Disclosure Matters**

1. Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations (the "MD&A"), and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

2. Review and discuss with management and the independent auditor the Company's quarterly financial statements, including disclosures made in the MD&A, prior to the filing of its Quarterly Report on Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

3. Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

4. Review and discuss quarterly reports from the independent auditors on:

a)  All critical accounting policies and practices to be used;

b)  All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

c)  Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

5. Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

6. Discuss with management and the independent auditor the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

7. Assume responsibility for oversight of (a) risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure, internal control over financial reporting, and credit and liquidity matters, and (b) the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies and strategies and programs and policies relating to legal compliance.

8. Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 (as amended), as adopted by the Public Company Accounting Oversight Board ("PCAOB"), relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, methods used to account for significant unusual transactions, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management over the application of accounting principles.

9. Ensure that a public announcement of the Company's receipt of an audit opinion that contains a going concern qualification is made promptly.

10. Review and discuss with management and the independent auditor the Company's disclosure controls and procedures.

11. Review significant new, or changes to existing, accounting, financial, external reporting and asset-safeguarding policies and practices.

*    *    *

**Design and Implementation of the Company's Internal Audit Function**

20. Assist Board oversight of the design and implementation of the Company's internal audit function.

**Effectiveness of Internal Controls**

21. Review and discuss with management and the independent auditor management's plan for establishing and maintaining internal controls, the

framework used to evaluate the Company's control structure and management's subsequent assessment of the effectiveness of the internal controls.

22. Review and discuss with management and the independent auditor disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Annual Report on Form 10-K and Quarterly Reports on Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

23. Review and discuss with management and the independent auditor any major issues as to the adequacy of the Company's internal controls, any special steps adopted in light of material or significant control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

24. Review and discuss with management and the independent auditor the Company's internal controls report and the independent auditor's attestation of the report prior to the filing of the Company's Annual Report on Form 10-K.

**Compliance Oversight Responsibilities**

25. Obtain from the independent auditor assurance that the audit was conducted in a manner consistent with Section 10A of the Exchange Act.

26. Obtain reports from management, the Company's General Counsel and the independent auditor that the Company and its subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Company's Code of Conduct. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Conduct.

27. Review and approve all related party transactions, as defined by applicable NYSE rules.

28. Oversee the establishment of procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

29. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies, and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

30. Discuss with the Company's General Counsel legal matters that may have a material impact on the Company's financial statements.

31. Discuss with the Company's General Counsel matters that involve the Company's compliance and ethics policies. For clarity, the General Counsel shall have direct reporting obligations to the Audit Committee through the authority to communicate personally to the Audit Committee (a) promptly on any matter involving criminal conduct or potential criminal conduct and (b) no less than annually on the implementation and effectiveness of the Company's compliance and ethics program.

## THE CORPORATE GOVERNANCE GUIDELINES

39.     Seritage also maintains Corporate Governance Guidelines. In a section titled "Trustee Responsibilities," the Guidelines state as follows:

The basic responsibility of the Trustees is to exercise their business judgment in good faith to act in what they reasonably believe to be in the best interests of the Company.  In discharging that obligation, Trustees should be entitled to rely on the honesty and integrity of their fellow Trustees and the Company's senior executives and outside advisors and auditors. The Trustees shall also be entitled to have the Company purchase reasonable Trustees' and Officers' liability insurance on their behalf, to the benefits of indemnification to the fullest extent permitted by law and the Company's declaration of trust, bylaws and indemnification agreements, and to exculpation as provided by law and the Company's declaration of trust.

The Board and each committee have the power to hire, at the expense of the Company, independent legal, financial and other advisors as they may deem necessary, without consulting or obtaining the approval of any officer of the Company in advance.  The Board and each committee recognize that the expenses incurred by the Board are ultimately paid for by the shareholders.  The Board and its committees are committed to evaluating the benefit and the cost to the shareholders of its actions.  Trustees are expected to devote the time and to have the ability to analyze and evaluate business decisions without the reliance on outside advisors, except where the specific circumstances dictate otherwise.

## SUBSTANTIVE ALLEGATIONS

40.     The Relevant Period begins on July 7, 2022, when the Company filed a preliminary proxy statement on Schedule 14A with the SEC (the "Preliminary 2022 Proxy"). The Preliminary 2022 Proxy solicited shareholder approval of the Plan of Sale and stated as follows, in relevant

14

part:

### PROPOSAL 4: PLAN OF SALE AND DISSOLUTION

At the Annual Meeting, our shareholders will be asked to consider and vote upon a proposal for approval of the plan of sale. If our shareholders approve this proposal, we will be authorized to begin implementing the plan of sale as soon as practicable. Pursuant to the plan of sale, the Board will have the authority to approve the disposition of any or all of our assets in one or more transactions.

*     *     *

After selling all of our assets and paying off all of our known liabilities and expenses, and making reasonable provisions for any unknown or contingent liabilities, we expect to distribute the net proceeds of our plan of sale to our shareholders. Based upon management's review and evaluation with its advisors, including CBRE, and with input from the Special Committee's financial advisor, Barclays, if the plan of sale is approved by our shareholders and we are able to successfully implement the plan of sale, we have estimated, based on data and information reviewed by management of the Company as of or prior to early June 2022 (without taking into account macroeconomic, market or other factors after June 7, 2022), that the Estimated Total Shareholder Distributions Range will be between $18.50 and $29.00 per share. Our Estimated Total Shareholder Distributions Range was derived from the estimated total gross asset sale proceeds, less [debts, expenses, and wind-down costs].

41.     On August 9, 2022, the Company issued a press release reporting that the Company held $2,237,313,000 in total assets, including $1,032,979,000 in real estate investment.

42.     The same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "2Q22 10-Q"). Appended to the 2Q22 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Olshan and Garilli, attesting to the accuracy of the financial statements contained therein.

43.     The 2Q22 10-Q stated that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired." The 2Q22 10-Q also stated the following regarding internal

controls over financial reporting:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures.**

Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of such date.

44.    On September 14, 2022, the Company filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy"). Defendants Olshan, McClain, Metz, Neva-Hacohen, Osberg, Sabshon, Thrush, and Wilsmann solicited the 2022 Proxy and solicited stockholders to approve, among other things, the Plan of Sale and the re-election of Defendants Metz and Sabshon to the Board.

45.    The 2022 Proxy provided the following regarding the Plan of Sale, stating that "the Company's estimate of total gross asset sale proceeds ranged from $2,848,035,000 to $3,557,999,000." The 2022 Proxy stated the following regarding the Company's Estimated Total Shareholder Distribution Range, stating, in relevant part:

[T]he Estimated Total Shareholder Distributions Range of between $18.50 and $29.00 was derived based on data and information reviewed by Company management and advisors as of or prior to early June 2022, and was designed to reflect a range to account for potential fluctuations to the inputs used to derive the range and, as a result, variability to the amount that will ultimately be distributed to our Class A shareholders.

46.    On October 24, 2022, the Company filed a current report on Form 8-K with the SEC announcing that the Plan of Sale had been approved by stockholders.

47.    On November 9, 2022, the Company issued a press release reporting that the

Company had total assets valued at $2,054,526,000, including $960,756,000 in real estate investment.

48.     The same day, the Company filed a quarterly report on Form 10-Q filed with the SEC (the "3Q22 10-Q"). Appended to the 3Q22 10-Q were SOX certifications, signed by Defendants Olshan and Garilli, attesting to the accuracy of the financial statements contained therein.

49.     The 3Q22 10-Q alleged that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired." The 3Q22 10-Q further stated the following regarding internal controls over financial reporting:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures.**

Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of such date.

50.     On March 14, 2023, the Company issued a press release reporting that the Company held $1,841,721,000 in total assets, including $579,099,000 in real estate investments.

51.     The same day, the Company filed an annual report on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Olshan, Garilli, Metz, McClain, Osberg, Sabshon, Nevo-Hacohen, Thrush, and Wilsmann. Appended to the 2022 10-K were SOX certifications, signed by Defendants Olshan and Garilli, attesting to the accuracy of the financial

statements contained therein.

52.     The 2022 10-K stated that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired." The 2022 10-K stated the following regarding internal controls over financial reporting:

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) under the Exchange Act) that are designed to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

*       *       *

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures. Based on that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective.

53.     On April 4, 2023, the Company issued a press release (the April 2023 Press Release"). The April 2023 Press Release  provided the following chart reflecting the Company's first quarter 2023 disposition activity and providing the following projections:

| Category | As of 1/1/2023 Total Properties | 2023 Sales Projections as of 3/31/2023 | | | | | 2024 & Beyond Remaining |
|---|---|---|---|---|---|---|---|
| | | Sold | Under Contract - No DD | Under Contract - in DD | PSA Neg. | Remaining 2023 Transactions | |
| Gateway markets | 11 | - | 2 | - | - | - | 9 |
| Primary markets | 43 | 10 | 9 | 1 | 4 | 9 | 10 |
| Secondary markets | 35 | 12 | 6 | 2 | 3 | 5 | 7 |
| Tertiary markets | 16 | 5 | 2 | 2 | 3 | 4 | - |
| **Market Composition Total** | **105** | **27** | **19** | **5** | **10** | **18** | **26** |
| Multi-Tenant Retail | 32 | 18 | 6 | 1 | 1 | 1 | 5 |
| Premier | 10 | - | 2 | - | - | - | 8 |
| Residential | 5 | 2 | 1 | - | - | - | 2 |
| Other Unconsolidated Entities | 13 | - | 3 | - | 1 | 2 | 7 |
| Non-Core Properties | 45 | 7 | 7 | 4 | 8 | 15 | 4 |
| **Property Type Total** | **105** | **27** | **19** | **5** | **10** | **18** | **26** |
| Under $10M | 59 | 16 | 5 | 4 | 9 | 16 | 9 |
| $10M - $30M | 27 | 10 | 9 | 1 | 1 | 1 | 5 |
| $30M - $50M | 11 | 1 | 3 | - | - | 1 | 6 |
| Over $50M | 8 | - | 2 | - | - | - | 6 |
| **Transaction Size Total** | **105** | **27** | **19** | **5** | **10** | **18** | **26** |

54.     On May 10, 2023, the Company issued a press release reporting that the Company held $1,516,373,000 in total assets including $564,046,000 in real estate investment.

55.     The same day, the Company filed a quarterly report on Form 10-Q filed with the SEC (the "1Q23 10-Q"). Appended to the 1Q23 10-Q were SOX certifications, signed by Defendants Olshan and Garilli, attesting to the accuracy of the financial statements contained therein.

56.     The 1Q23 10-Q stated that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired." The 1Q23 10-Q stated the following regarding internal controls over financial reporting:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures.**

19

Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of such date.

57.    On August 14, 2023, the Company issued a press release reporting that the Company held $1,167,967,000 in total assets, including $447,874,000 in real estate investment.

58.    The above referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to fail to disclose to investors that: (1) the Company failed to sufficiently identify and review impairment indicators for investments in real estate; (2) as a result, the Company provided inaccurate valuations and projections of gross proceeds for certain real estate assets; (3) the Company lacked effective internal controls; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH BEGINS TO EMERGE

59.    On August 14, 2023, the Company filed a quarterly report on Form 10-Q with the SEC (the "2Q23 10-Q"). Appended to the 2Q23 10-Q were SOX certifications, signed by Defendants Olshan and Garilli, attesting to the accuracy of the financial statements contained therein.

60.    The 2Q23 10-Q revealed that there was a "material weakness" in the Company's internal control over financial reporting "due to a deficiency in the design of our control over the identification of impairment indicators for investments in real estate and documentation of

evidence of review." The 2Q23 10-Q further described the material weakness, as follows, in relevant part:

**Evaluation of Disclosure Controls and Procedures.**

Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that, as of the end of the reporting period covered by this report, our disclosure controls and procedures were not effective due to the material weakness described below.

*       *       *

**Material Weakness**

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. In the course of preparing our financial statements for the interim period ended June 30, 2023, management identified a material weakness in our internal control over financial reporting that existed due to a deficiency in the design of our control over the identification of impairment indicators for investments in real estate and documentation of evidence of review. The deficiency relates to the failure to identify potential indicators of impairment related to development projects in a timely manner. This deficiency contributed to the potential for there to be material errors in our financial statements.

61.     On this news, the Company's stock price fell more than 9%, from a closing price of $8.89 per share on August 14, 2023 to a closing price of $8.03 per share on August 15, 2023.

62.     On November 8, 2023, the Company issued a press release reporting that the Company held $1,016,290,000 in total assets, including $398,028,000 in real estate assets, and stated that the Company's Future Sales Projections for all assets were "anticipated to occur in 2024 and beyond," providing, in relevant part:

The data below provides additional information regarding current ***estimated gross sales proceeds per asset in the portfolio*** as of November 7, 2023

* * *

Gateway Markets

- One Multi-Tenant Asset $25 - $30 million
- **_Nine Premier Assets_** (Dallas & UTC are each assumed to be sold in two transactions)
  - **_One Asset $15 - $20 million_**
  - **_One Asset $35 - $40 million_**
  - **_One Asset $40 - $45 million_**
  - **_One Asset $45 - $50 million_**
  - **_One Asset $50 - $60 million_**
  - **_One Asset $70 - $80 million_**
  - **_One Asset $100 - $150 million_**
  - **_Two Assets $200 - $300 million_**

63.     The same day, the Company filed a quarterly report on Form 10-Q filed with the SEC (the "3Q23 10-Q"). Appended to the 3Q23 10-Q were SOX certifications, signed by Defendants Olshan and Garilli, attesting to the accuracy of the financial statements contained therein.

64.     The 3Q23 10-Q stated that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired." The 3Q23 10-Q stated the following regarding internal controls over financial reporting, in relevant part:

> **Evaluation of Disclosure Controls and Procedures.**
>
> Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report.

* * *

Notwithstanding the material weaknesses in our internal control over financial reporting, our principal executive officer and principal financial officer have concluded that the unaudited condensed consolidated financial statements included in this Form 10-Q fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States of America.

65.    On April 1, 2024, the Company issued a press release reporting that the Company held $973,864,000 in total assets, including $411,037,000 in investment in real estate. The press release also reported the Company's Future Sales Projections and estimated gross sales proceeds per asset, stating, in relevant part:

Gateway Markets

- One Multi-Tenant Asset $25 - $30 million
- ***Nine Premier Assets*** (Dallas & UTC are each assumed to be sold in two transactions)
    - ***One Asset $15 - $20 million***
    - ***One Asset $30 - $35 million***
    - ***Two Assets $40 - $45 million each***
    - ***One Asset $50 - $60 million***
    - ***One Asset $70 - $80 million***
    - ***One Asset $100 - $150 million***
    - ***Two Assets $200 - $300 million each***

66.    On April 1, 2024, the Company filed an annual report on Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Olshan, Garilli, Metz, McClain, Sabshon, Nevo-Hacohen, Thrush, and Wilsmann. The 2023 10-K stated that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired." The 2023 10-K stated the following regarding internal controls over financial reporting, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d – 15(e) under the Securities Exchange Act of 1934, as amended, (the "Exchange Act")).

\*      \*      \*

Notwithstanding the material weaknesses in our internal control over financial reporting, our principal executive officer and principal financial officer have concluded that the audited consolidated financial statements included in this Form 10-K fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States of America.

67.    The statements above were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company failed to sufficiently identify and review impairment indicators for investments in real estate; (2) as a result, the Company provided inaccurate valuations and projections of gross proceeds for certain real estate assets; (3) the Company lacked effective internal controls; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

68.    On May 10, 2024, the Company issued a press release (the "May 2024 Press Release") announcing that the Company was "adjusting [its] pricing projections for some of [its] assets " and that, as a result, the gross value of the Company's portfolio of assets was reduced by at least $325 million. Specifically, the May 2024 Press Release stated, in relevant part:

". . . Based on *our broad transaction experience*, we are seeing a few themes emerge. Assets previously underwritten for life sciences or tech office are now frequently being reconsidered for other uses in higher demand but with less aggressive rent profiles, which, taken together with high construction costs, drives down the amount that can be paid for land. We are also seeing investors focusing on less risky debt or cash flowing equity investments to generate double-digit returns. Yet, some with a longer-term view are starting to come back to the

development market. With more stability in interest rates and inflation, buyers are able to underwrite deals more confidently, albeit at lower valuations. ***As such we are adjusting our pricing projections for some of our assets***." said Andrea L. Olshan, Chief Executive Officer and President.

*       *       *

**Future Sales Projections**

The data below provides additional information regarding current estimated gross sales proceeds per asset in the portfolio as of May 7, 2024, excluding assets under contract or in PSA negotiation, which are described above. The assets listed below are either being marketed or are to be marketed and, as a result, any sales thereof are anticipated to occur in 2024 and beyond. Sales projections are based on the Company's latest forecasts and assumptions, but the Company cautions that actual results may differ materially. In addition, see "Market Update" below and the "Risk Factors" section contained in the Company's filings with the Securities and Exchange Commission for discussion of the risks associated with such estimated gross sale proceeds.

Gateway Markets

- One Multi-Tenant Asset $25 - $30 million
- ***Eight Premier Assets*** (Dallas & San Diego are each assumed to be sold in two transactions)
    - ***One Asset $15 - $20 million***
    - ***Two Assets $30 - $35 million***
    - ***Two Assets $50 - $60 million***
    - ***One Asset $60 - $70 million***
    - ***One Asset $100 - $150 million***
    - ***One Asset $150 - $200 million***

69.     On this news, the Company's stock price fell more than 27.3%, from a closing price of $9.32 per share on May 10, 2024 to a closing price of $6.78 per share on May 13, 2024.

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING PROXY STATEMENTS**

70.     As detailed above, the 2022 Proxy was solicited by Olshan, McClain, Metz, Neva-Hacohen, Osberg, Sabshon, Thrush, and Wilsmann.

71.     On April 7, 2023, the Company filed a proxy statement on Schedule 14A with the

SEC (the "2023 Proxy"). Defendants Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Thrush, and Wilsmann solicited the 2023 Proxy and solicited stockholders to approve, among other things, the election of Defendants Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Thrush, and Wilsmann to the Board, as well as the Company's executive compensation program for the Company's named executive officers.

72.     On April 23, 2024, the Company filed the 2024 Proxy. Defendants Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Thrush, and Wilsmann solicited the 2023 Proxy and solicited stockholders to approve, among other things, the election of Defendants Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Thrush, and Wilsmann to the Board, as well as the Company's executive compensation program for the Company's named executive officers.

73.     The 2022 Proxy, the 2023 Proxy, and the 2024 Proxy were materially misleading and failed to disclose that: (1) the Company failed to sufficiently identify and review impairment indicators for investments in real estate; (2) as a result, the Company provided inaccurate valuations and projections of gross proceeds for certain real estate assets; (3) the Company lacked effective internal controls; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **DAMAGES TO SERITAGE**

74.     As a direct and proximate result of the Individual Defendants' misconduct, Seritage has expended and will continue to expend significant sums of money.

75.     Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

76.     Such expenditures will also include costs incurred in any internal investigation

pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

77.    As a direct and proximate result of the Individual Defendants' conduct, Seritage has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

79.    Seritage is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

80.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

81.    Plaintiff is an owner of Seritage stock and has been a continuous holder of the Company's common shares at all relevant times.

82.    A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following five individuals: Defendants Metz, Sabshon, McClain, Thrush, Nevo-Hacohen, and Wilsmann (the "Trustee Defendants"). Plaintiff is required to show that a majority of directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, none of the

Board's current directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

83.    Each of the Trustee Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Trustee Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

84.    The Trustee Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Trustee Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Trustee Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Trustee Defendants could not fairly and fully prosecute such a suit even if they instituted it.

85.    The Trustee Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

86.    Defendant Metz has served as a Company trustee since 2022. Defendant Metz receives significant compensation from the Company as detailed above. Defendant Metz signed

the 2022 and 2023 10-Ks, and solicited the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy, all of which contained false and misleading statements. As a Company trustee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Metz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

87.    Defendant McClain has served as a Company trustee since 2015. Defendant McClain receives significant compensation from the Company as detailed above. Defendant McClain signed the 2022 and 2023 10-Ks, and solicited the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy, all of which contained false and misleading statements. As a Company trustee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant McClain breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

88.    Defendant Sabshon has served as a Company trustee since 2022. Defendant Sabshon receives significant compensation from the Company as detailed above. Defendant Sabshon signed the 2022 and 2023 10-Ks, and solicited the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy, all of which contained false and misleading statements. As a Company trustee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant

29

Sabshon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

89.     Defendant Thrush has served as a Company trustee since 2019. Defendant Thrush receives significant compensation from the Company as detailed above. Defendant Thrush signed the 2022 and 2023 10-Ks, and solicited the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy, all of which contained false and misleading statements. As a Company trustee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Thrush breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

90.     Defendant Nevo-Hacohen has served as a Company trustee since 2022. Defendant Nevo-Hacohen receives significant compensation from the Company as detailed above. Defendant Nevo-Hacohen signed the 2022 and 2023 10-Ks, and solicited the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy, all of which contained false and misleading statements. As a Company trustee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Nevo-Hacohen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

91.     Defendant Wilsmann has served as a Company trustee since 2022. Defendant Wilsmann receives significant compensation from the Company as detailed above. Defendant Wilsmann signed the 2022 and 2023 10-Ks, and solicited the 2022 Proxy, the 2023 Proxy, and the

2024 Proxy, all of which contained false and misleading statements. As a Company trustee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wilsmann breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

92.    Defendants Metz, McClain, Sabshon, and Thrush either serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices as alleged above. Therefore, Metz, McClain, Sabshon, and Thrush cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

93.    The Trustee Defendants, as members of the Board, were and are subject to the Company's Code of Conduct, which goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Trustee Defendants to also adhere to Seritage's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Trustee Defendants violated the Code of Conduct, they face a substantial likelihood of liability for

31

breaching their fiduciary duties, and therefore demand upon them is futile.

94.    The Trustee Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

95.    The Trustee Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Seritage. If there is a liability insurance policy covering the Trustee Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Trustee Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Seritage, there would be no insurance protection. Accordingly, the Trustee Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

96.    If there is no liability insurance, then the Trustee Defendants will not cause Seritage to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured

individual liability. Accordingly, demand is futile in that event as well.

97.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT ONE

**Against the Proxy Defendants for Violations of Section 14(a) of the Exchange Act**

98.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.    The Proxy Defendants solicited the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy containing materially false and misleading statements and/or omissions.

100.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

101.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

102.    The 2022 Proxy, the 2023 Proxy, and the 2024 Proxy failed to disclose that: (1) the Company failed to sufficiently identify and review impairment indicators for investments in real estate; (2) as a result, the Company provided inaccurate valuations and projections of gross proceeds for certain real estate assets; (3) the Company lacked effective internal controls; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

103.    In exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

104.    The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy.

105.    Plaintiff on behalf of Seritage has no adequate remedy at law.

## COUNT TWO

### Against the Individual Defendants for Breach of Fiduciary Duties

106.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Seritage's business and affairs.

108.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

109.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Seritage.

110.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

111.    In further breach of their fiduciary duties owed to Seritage, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company failed to sufficiently identify and review impairment indicators for investments in real estate; (2) as a result, the Company provided inaccurate valuations and projections of gross proceeds for certain real estate assets; (3) the Company lacked effective internal controls; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

112.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

113.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and

35

omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

114.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

115.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

116.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Seritage has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

117.    Plaintiff on behalf of Seritage has no adequate remedy at law.

**COUNT THREE**

**Against the Individual Defendants for Unjust Enrichment**

118.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Seritage.

120.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Seritage that was tied to the performance or artificially-inflated valuation of Seritage or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

121.    Plaintiff, as a shareholder and a representative of Seritage, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

122.    Plaintiff on behalf of Seritage has no adequate remedy at law.

## <u>COUNT FOUR</u>

### Against the Individual Defendants for Waste of Corporate Assets

123.    Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

124.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

125.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination

payments to certain of its executive officers, as detailed, *supra*; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

126.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

127.    Plaintiff, on behalf of Seritage, has no adequate remedy at law.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.     Awarding punitive damages;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: May 8, 2025                               **THE ROSEN LAW FIRM, P.A.**

                                                 */s/ Phillip Kim*
                                                 Phillip Kim
                                                 275 Madison Avenue, 40th Floor
                                                 New York, NY 10016
                                                 Telephone: (212) 686-1060
                                                 Fax: (212) 202-3827
                                                 Email: philkim@rosenlegal.com

                                                 *Counsel for Plaintiff*

## **VERIFICATION**

I, Derrick Cheroti am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 4/18/202 5

Derrick Cheroti

Derrick Cheroti